## Case No. 16,673.

### UNITED STATES v. WHITE.

[1 Cal. Law J. 275.]

District Court, N. D. California. Aug. 19, 1862.[1]

MEXICAN LAND GRANTS—PROCEEDINGS FOR CONFIRMATION—GENUINENESS OF PAPERS—EVIDENCE.

[The only documentary evidence of a grant was produced from the claimant's possession, and consisted of a sheet of paper containing a petition to the governor, dated in 1840, a mar-

[1] [Affirmed in 1 Wall. (68 U. S.) 660.]

ginal order of reference, an informe, and a decree of concession, together with a map of the land. There was no trace of the existence of the grant in the archives, but strong presumptive evidence against it, in records of subsequent dates, showing that the authorities considered the land as still open to grant, and that petitioners for neighboring lands knew nothing of the grantee's claim. The genuineness of the papers produced rested on the testimony of witnesses known to have been connected with previous frauds, similar to that alleged in this case; and the testimony of the only witness who attempted to account for the map was manifestly false in many particulars. The date of one of the title papers had been altered, and no explanation thereof was suggested consistent with the bona fides of the transaction. The grantee neglected for three years from the date of the alleged grant to take any steps to perfect his title, as required by the colonization laws, and then left the country, under circumstances suggesting an intention to abandon his right. He had never himself occupied the land, but it was in possession of a relative. He claimed that this possession was in his behalf, but the relative repudiated the claim, and afterwards sought a grant of the land for himself, and his right was recognized by the adjoining landowners in apparent ignorance of the alleged grant to the present claimant. Held, that upon this evidence the claim must be rejected. U. S. v. Noe, 23 How. (64 U. S.) 312, and U. S. v. Alviso, Id. 318, distinguished.]

"Charles White, claimant for Arroyo de San Antonio, in Sonoma county, granted August 10, 1840, by Juan B. Alvarado to Antonio Ortega, claim filed February 7, 1853, confirmed by the commission June 26, 1855, by the district court August 17, 1857, decree reversed by the supreme court, and record remitted for further proceedings. [U. S. v. White] 23 How. [64 U. S.] 249."

[Motion made by the heirs of Juan Miranda to be allowed to intervene was denied. Case No. 16,680.]

HOFFMAN, District Judge. The claim in this case having been confirmed by the board, and by this court, at a session held by the circuit judge [case unreported], an appeal to the supreme court was taken, the decree of this court reversed, and the cause remanded for further proofs. In their final or supplementary opinion the supreme court, after ordering the decree of this court to be reversed and set aside, said: "We do this that the district court may not be trammeled in their future consideration of this cause on all its merits, but without intimating any opinion as to the validity of the grant to Antonio Ortega. It is due to the attorney general to say that on the argument of this case he challenged the grant as fraudulent, and it is because we do not think the whole evidence on that point was fully developed on the former trial that this order is made." U. S. v. White, 23 How. [64 U. S.] 255. The cause has thus been remanded to be considered "de novo" on all its merits by this court, untrammeled by the decision of the supreme court as to either the validity or the genuineness of the grant. I shall, therefore, examine into its merits precisely as if it were now for the first time submitted for decision.

The documentary title, on which the claimant relies, consists of a sheet of paper containing a petition to the governor, a marginal order of reference, an informe, and a decree of concession. He also produces a map of the land solicited. The petition is in the name of Antonio Ortega, and is dated June 12, 1840. The marginal order is in the handwriting of, and signed by, Alvarado, and dated June 30, 1840. The informe is signed by M. G. Vallejo, and dated July 30, 1840. The decree of concession is dated August 10, 1840, and is as follows: "In conformity with the information given by the military commander of the frontier of Sonoma, and in virtue of the faculties with which I am invested, I grant to Don Antonio Ortega the land petitioned for, with the understanding that, in order to obtain the issuance of the respective titulo, and to regularly make up the necessary expediente, by which the boundaries should be marked, and the necessary proceedings be taken, he shall make a map, as required by law, which he shall present without delay, together with this instancia, which shall serve him as security during the further proceedings indicated."

These documents are produced, together with a map, which will hereafter be noticed, from the custody of the claimant. It is not pretended that they were at any time on file in the public archives. On the contrary, it is urged that, from their own nature, and by the terms of the order that they be returned to the interested party, they could not properly have been archived. The records, therefore, fail to afford any confirmation whatever of the genuineness of the grant, or, indeed, any trace of its existence. Of the evidence from the archives, relied on by the United States to disprove its genuineness, we will speak hereafter. It will be observed that the document above transcribed purports, on its face, to be a kind of preliminary or provisional concession, intended to serve as security to the party while the necessary proceedings required by the colonization laws were in progress. It contemplates and requires that a map shall be presented, in order that the expediente shall be framed, by which the boundaries are to be designated, and which is to pass through the proper channels of business ("correr los limites necessarios," Seoane's Neuman & Baretti's Sp. Dic., by Velasquez, ap. verb. "correr"), in order that the grant, "titulo," may issue.

It is plain from the language of this decree that the governor intended that the title should be perfected in the usual manner, and the concession returned to the party "for his security" was in no manner meant to operate as a final grant of the land. The case thus bears a close analogy to those of U. S. v. Noe, 23 How. [64 U. S.] 315, and of U. S. v. Alviso, Id. 318. In the former case, which is nearly identical with the case at bar, the claim was rejected, on the ground that the grantee had wholly neglected to take any steps towards the completion of his title, or the fulfillment, by occupation and authorization, of the obligations it imposed.

In the case of Alviso, the claim was confirmed, it appearing that, though the claimant had only a permission to occupy while the proceedings for the perfection of his title were pending, yet that he had improved and cultivated the land, and had resided upon it with his family since 1840, and that since that year he had been recognized as its proprietor. On the occupation of the country by the United States forces, he or his representatives were found in the undisputed possession of the rancho. As was observed by the court, "no imputation was made against the integrity of his documentary evidence, and no suspicion exists unfavorable to the bona fides of his petition, or the continuity of his possession and claim."

Under the authority of these two cases, which, so far as the documentary evidence of title is concerned, closely resemble the case at bar, the decision of the latter must depend upon whether the genuineness of the title papers has been satisfactorily established; and, if so, whether the inchoate right thus obtained has been, by a long continued occupation and cultivation, and the recognition of the claimant's rights, ripened into an equitable title, which the United States are bound to respect. These two inquiries, though in their nature distinct, it will, nevertheless, be found most convenient to prosecute simultaneously.

It has already been observed that no trace of the alleged grant is found in the archives. The proofs of its genuineness consist in the production of the grant itself, aided by the depositions of Juan B. Alvarado, Antonio Ortega, the grantee, William Richardson, Jose de la Rosa, and M. G. Vallejo.

Ortega testifies to the genuineness of his own and of Alvarado's and Vallejo's signatures. He states that, after the making of the decree, and during the same year, he applied to Governor Alvarado for a full and formal title; but it was during a recess of the departmental assembly, and he could not obtain it. He further states that he did not occupy the land in person, but that his father-in-law, Miranda, occupied it for him in 1840. That Miranda placed his son there, who remained six years, having a hut there and fifty cows; that he applied to the governor, with the paper before mentioned, and presented a map. He then went to Oregon, leaving his papers with the governor. He subsequently states that he went to Oregon in 1843, and remained there four years; that, on his return, he found Theodore Miranda was occupying the land, which he continued to do until 1848. He then went to the governor, and obtained the papers which had been left with him. He further states that he demanded the possession of the widow of Miranda, but she replied that the land belonged to her, and that she had a paper from Murphy and Leese, the alcalde of Sonoma.

William Richardson testifies that the land was granted to Ortega in 1840, but that it was not occupied by him in person. It was occupied by the family of Juan Miranda by virtue of a contract between him and Ortega, but shortly afterwards all the family left, except Theodore, who continued to occupy it when he (the witness) was last there (1850). That he understood Miranda occupied for Ortega from the statements of both of them.

Alvarado testifies twice before the board. In his first deposition he merely states that his signatures are genuine, and written at their dates. In the second deposition he identifies the map produced by the claimant as the one presented to him in 1840 or 1841, and left with the petition and decree of concession in his hands for safe-keeping until 1848, when he delivered them up to Ortega. In a third deposition, taken since the case was remanded, Alvarado states that Ortega presented himself to him only twice, and that on the second occasion, which was after an interval of six months or a year, he brought the petition and map, which he left with him. But in this statement he is evidently in error, for the marginal order for an informe is dated at Monterey, June 20, 1840. The informe of Vallejo is dated at Sonoma, July 30, 1840, and the decree of concession is dated at Monterey, August 10, 1840. This latter shows that the map had not then been presented. It is evident that the petition must have been twice presented to the governor without the map, and the latter was afterwards added to it, at some time subsequent to the date of its second presentation. The circumstance is of some importance, in connection with other facts relative to the map, hereafter to be noticed.

M. G. Vallejo testifies that in 1838 or 1839 Ortega applied to him for permission to occupy the rancho; that he gave the permission, and immediately afterwards Ortega moved on to the land, taking with him his father-in-law, Juan Miranda, and his family; that he built a house and corral, and stocked the place with horses and cattle; that he (witness) furnished the stock, and Ortega went on to cultivate the land. He afterwards obtained a grant from Alvarado about 1840. This evidence, it will be observed, conflicts, in its most important statements, with that of Richardson and Ortega himself. Both of the latter assert that Ortega never occupied the land in person, that the cattle belonged to Miranda, and that the occupation did not commence until after the grant. Ortega makes no mention of any permission to occupy obtained from Vallejo. No such permission is produced, though it was usually, if not invariably in writing, nor does any witness pretend to have seen such a document; and, what is still more decisive, the petition of Ortega to the governor is wholly silent as to the fact that such a permission had been obtained from the director of colonization of the northern frontier, the mention of which

would have strongly enforced his application, and, in all probability, obviated the necessity of referring the petition to the same Vallejo for his informe. In his report to the governor, Vallejo in like manner omits all mention of the circumstance that he had already given permission to the applicant to occupy the land, and of the equally important facts that Ortega had already built a house upon it, stocked it, and was residing on it with his family. We may safely conclude that if Ortega, at the date of his petition, had already obtained a permission to occupy from the director of colonization, if he had "built a house and corral upon it, stocked the place with horses and cattle, and had gone on to cultivate a portion of it," his petition and the report of Vallejo would have contained some allusion to the circumstances.

Jose de la Rosa testifies that in 1844 Miranda applied to him to draw up a petition to the governor (Micheltorena) for a grant of the place called "San Antonio"; that he wrote the petition, and presented it for Miranda to the governor, who postponed making the grant, being otherwise occupied; that a grant was written out in the secretary's office, but not signed, on account of the outbreak of civil disturbances. De la Rosa also states that in 1839 Ortega applied to him in Sonoma to make a map of the place called "San Antonio," as he wished to apply to General Vallejo for leave to occupy it; that he accordingly made the map for him, which is the one produced by the claimant. Afterwards, in 1840, Ortega procured him to write a petition to the governor for the same land, and this map was presented to the governor with the petition; that Ortega obtained the permission from Vallejo in 1839 to occupy the land, and he did occupy it, and was in the occupation of it when he presented his petition to Alvarado for the grant; that Governor Alvarado granted the land; he (witness) saw the grant a short time after the petition was presented, in the house of Ortega, on the rancho; that Ortega left his family and Juan Miranda on the land when he went to Oregon, in order that he might not lose his right to it.

It is unnecessary to refer at length to the character of this witness, as disclosed by his own avowal that in 1844, he was endeavoring to obtain for Miranda a grant of lands which he knew had already been granted in 1840 to Ortega; or, as established in the case of Luco v. U. S. [Case No. 8,594] and other cases, in which the unreliability of his statements, and those of several other of the claimant's witnesses, have been judicially declared by the supreme court. It is enough to say that nearly every line of his deposition in this case contains a falsehood. He asserts that he wrote the petition of Miranda in 1844. The petition is in the archives, and is not in his handwriting. He asserts that he prepared a map for Ortega in 1839, which was presented, with his petition, in 1840. The claimant's own title papers prove the contrary.

He swears that Ortega obtained a permission from Vallejo to occupy the land, and that he did occupy it. In these statements he is contradicted by Richardson and Ortega himself. He asserts that he saw the grant in Ortega's house on the rancho. Ortega asserts that he never occupied the land in person, and that the house was Miranda's. He states that Ortega left his family on the land when he went to Oregon, in order to preserve his rights to it.

The evidence is conclusive that Ortega abandoned his wife on account of her infidelity, that he has never lived with her since, and that, on his departure, she went to her father's house to live. The map referred to by that witness is that produced by the claimant, and stated by Alvarado to have been handed to him, as required by the decree. In the expediente of Juan Miranda, found in the archives, and of undoubted authenticity, a map is found, nearly a fac simile of the one produced by the claimant. The two were evidently made by the same person, and at the same time.

The theory of the claimant is that Miranda, in 1844, obtained a copy of Ortega's map, and presented it with his petition. But Ortega's map was then, as the claimant alleges, in Alvarado's private custody, and was not accessible to Miranda, and, besides, the two maps bear unmistakable evidence of having been prepared at the same time. There must, therefore, have been prepared, if the claimant's theory be true, two maps for Ortega, in 1840, one of which was presented to the governor, and the other subsequently passed into the hands of Miranda. If this be so, how happens it that De la Rosa speaks of having prepared only one map? He would hardly have forgotten the circumstance that, when he presented Miranda's petition to the governor. he also presented one of the maps prepared by him for Ortega five years previously. The character of this witness, and the nature of his testimony, is such that it is a waste of time to consider it, but (he is the claimant's witness) it is just to observe that his evidence is, on the point last referred to, inconsistent with the claimant's own theory of the case.

The above are all the witnesses on the part of the claimant who testify directly, and of their own knowledge, to the execution of the grant. I shall hereafter advert to other proofs adduced to corroborate and confirm these statements.

The United States have produced from the archives various expedientes, relied on to show that the government, long after the date of the alleged grant to Ortega, treated the land as public, and subject to grant, and that it was by all his neighbors considered to belong to Juan Miranda. These documents are: First—The expediente of Juan Miranda. This expediente is found in the archives duly numbered and entered on Jimeno's Index. Its authenticity is unquestionable. It consists of—(1) A petition of Miranda, dated

February 21, 1844. (2) A certificate by Jacob P. Leese, alcalde of Sonoma, that the land had been occupied several years, and that it did not belong to any pueblo or corporation, dated February 20, 1844. (3) A report by Jimeno, dated May 2, 1844, that the land had been occupied for four years by the party interested, by cultivation and by having a house thereon, with all his goods, and that it does not belong to any one in particular. (4) An order that the title issue, signed by the governor, and dated May 30, 1844. (5) A decree of concession, dated October 8, 1844, declaring Juan Miranda owner of the place called "Arroyo de San Antonio," and directing the corresponding title to be made out and entered in the respective book, and the expediente to be sent to the departmental assembly for its approval. (6) Two copies of the formal grant or titulo, dated October 8, 1844, but unsigned. These were evidently made out in pursuance of the governor's order,—one to be delivered to the party, and the other to be retained, as was customary, in the office, and attached to the expediente.

It is not contended that the grant to Miranda was consummated by the delivery of the title paper. What was the cause of its nondelivery cannot be ascertained with certainty. The claimant supposes that the proceedings were suspended by the governor because the previously acquired rights of Ortega were brought to his notice, but of this there is no proof; and, admitting that Ortega had obtained in 1840 the concession now produced by the claimant, it is highly improbable that that fact was known to the governor, or had any effect to stay the issuance of the title to Miranda. The papers of Ortega were not in the archives. Those records contained no trace of any title to the land acquired by him. He had left the country, abandoning his wife and family under circumstances rendering his speedy return improbable. Miranda was reported both by Leese and Jimeno to have been in occupation of the land for several years. He was considered its owner by all his neighbors, as will be presently shown by other expedientes from the archives.

Alvarado, with whom Ortega's papers were deposited, makes no mention of having apprised Micheltorena of their existence. The alcalde of the district was ignorant of them, and it is not easy to conjecture by whom the information could have been furnished to the governor, or from what quarter a demonstration against the grant to Miranda could have come. But it may safely be assumed that if such remonstrance had been made, we should have found it among the papers in the expediente. The fact that the proceedings had been suspended for that reason would not have been unknown to Jimeno, and yet that officer includes this expediente in his list as of the number of those "concedidos" or granted.

The reason given by Francisca Miranda, the wife of Ortega, for her father's not obtain-

ing the grant is that he was taken sick, and could not attend to it.

Jose de la Rosa, the claimant's witness, distinctly avows that Micheltorena made no objection to granting the land, on the ground that it had already been granted to Ortega; and he states that it was not signed on account of the outbreak of civil disturbances. It is a matter of history that the revolution which terminated in the overthrow of Micheltorena commenced in the fall of 1844. It is proved in this case that Miranda died in 1845. It may well be, therefore, that the disordered state of public affairs, and the death of Miranda shortly after the commencement of the troubles, may have been the reason why the grant was not obtained. But, at all events, the proceeding advanced far enough to show that the governor was willing to grant the land, and that he, Leese, the alcalde, and Jimeno, the secretary, acted in total ignorance or entire disregard of the alleged rights of Ortega.

But the Miranda expediente seems to disclose another fact of some importance with relation to the occupation of the rancho. Miranda states in his petition that "for more than four years he has been in possession of a sitio on the Arroyo de San Antonio, which was provisionally granted to him by Senor Don Guadalupe Vallejo, the papers in relation to which concession, it seems, have been mislaid; that, although he has endeavored to recover them, they have not been found, for which reason he represents anew, saying that on the said place are maintained the regular number of flocks and herds, and the requisite cultivation."

We have already seen that Vallejo and De la Rosa swear that the provisional concession or permission to occupy was given to Ortega. But Ortega makes no mention of it, nor does his petition, when it would hardly have been omitted. If it be true, it is extraordinary that Miranda should have ventured to assert to the governor that the concession had been made to him, and it is still more extraordinary that Leese, the alcalde of Sonoma, and residing in the same village with Vallejo, should have failed to correct the misstatement, and have certified that the tract had been occupied several years by the interested party. Jimeno, too, appears either to have adopted without suspicion the statements of the petition, or else to have reported on his own knowledge, for he certifies that "the interested party has occupied the land he claims for four years by cultivation, and by having a house thereon, with all his goods,"—facts which he could not have derived merely from the certificate of Leese. That the rancho was originally occupied by Miranda under a provisional concession or permission by Vallejo is positively sworn to by Martin, the grantee of the neighboring rancho of Novato, and by Ramon Mesa, who says that he occupied it by putting about 300 head of cattle upon it, about 30 wild mares,

and some tame horses, and by building a house, a corral, etc. On his cross-examination, he states that he saw these cattle delivered to Miranda by Salvador Vallejo, and branded by Miranda with a brand he had made at a blacksmith's shop. It is true that the facts testified to by this witness occurred at a time when he was only 12 or 13 years old, but he is in some degree corroborated by Peter T. Sherrebeck, who swears that in 1843 there was produced to him, as inspector of hides at San Francisco, hides from the Miranda Rancho, branded "J. M.,"—the Miranda sign.

Jose Santos Berreyesa, who lived in Sonoma from 1837 to 1849, states that, during all that time, he never knew the rancho claimed by anybody but Juan Miranda, or occupied by any one but him and his family. He also swears that he certainly occupied the rancho before the year 1840. To the testimony of these witnesses must be added that of Francisca Miranda and that of G. A. Nye, the first of whom testifies that her father and brother first obtained their right to the rancho from Vallejo for the purpose of procuring a title from the government, and the second that Miranda was living in 1838 on his rancho, and that he saw in his possession a document signed, he thinks, by General Vallejo.

To the proofs thus afforded by the expediente of Miranda, the statements and the silence of Ortega, and the evidence of these numerous witnesses, the claimant opposes the unsupported declaration of Mariano G. Vallejo and of Jose de la Rosa. The preponderance, both of proofs and probabilities, is thus clearly in favor of the truth of the statements contained in Miranda's petition, and we are compelled to conclude that the permission to occupy was given to him, and not to Ortega, and that, under it, he entered on the land, and stocked and cultivated it as his own.

We have heretofore referred to the fact that the map found in the Miranda expediente and that produced by the claimant were evidently prepared by the same person, at the same time, and various reasons were adduced for supposing that Ortega could not have presented to the governor in 1840 the map now produced by the claimant. The petition of Miranda affords an important corroboration of this view. The petition of Ortega describes the land as "bounded on the south by the rancho of Camilo, on the north by the Roblar de la Miseria, on the east by the Estero de Petaluma, and on the west by the Laguna de San Antonio." On the map alleged to have been presented by Ortega to indicate this tract, neither the "Roblar de la Miseria," nor the "Rancho de Camilo," are laid down,—at least those names nowhere appear upon it, as would have been most natural if it had been drawn subsequently, and so as to conform to the description in the petition. On the other hand, the description of boundaries in the Miranda concession entirely conforms to the map, and is evidently taken

from it. The nonconformity between the description in Ortega's petition and the map he alleges he presented to indicate the land solicited thus affords a strong argument against the truth of his and Alvarado's statement that the identical map now produced was presented in 1840, in obedience to the governor's order in the decree of concession.

The United States have also produced a grant to B. Bojorquez with the expediente. Both in the petition dated August, 1844, and the grant dated November, '45, the "lands of Juan Miranda" are mentioned as one of the lands solicited. They also produce the expediente of J. N. Padilla, another colindante. In his petition, dated November, 1844, and the map that accompanied it, the "lands of Juan Miranda" are mentioned as a boundary; and Vallejo himself, to whom the petition was referred, reports: "The subscriber believes that the boundaries, with the rest of the rancho, are the same as those mentioned in the petition." If Vallejo knew that he had made provisional concession to Ortega of the lands described in the petition as those of Juan Miranda, that Ortega had subsequently obtained a grant for them, and that Miranda was occupying them as his tenant, it is strange that he did not correct the misdescription in Padilla's petition.

In the diseño of the rancho of Olimpali the same lands are again laid down as those of Juan Miranda. The evidence afforded by these expedientes may not be sufficient to demonstrate that Miranda obtained a grant, nor perhaps conclusively to show that he was not occupying the land for Ortega; but they establish beyond question that his neighbors on all sides regarded him as the owner of the land, and occupying it in his own right. If Ortega's present pretension be true, it is strange that no one of the colindantes was sufficiently informed of the facts to describe the land as his, and not Miranda's. On the other hand, the claimant has shown that the papers produced by him were in existence at least as early as 1839, when they were transferred to Father Brouillet, from whom the claimant derives title. He has also proved that in 1845 and 1846, while in Oregon, Ortega frequently spoke to Father Accolti and others of owning a rancho in California, a portion of which he desired to give to the father, in consideration of which his children should be educated. It appears, too, that Father Brouillet, before taking the conveyance from Ortega, was informed by Alvarado and Vallejo that the papers were genuine and the title valid. But these declarations have no importance, except so far as we may suppose Alvarado and Vallejo unwilling to practice a fraud upon a priest of their own church. How far they would have been affected by that consideration it is not easy to determine.

The claimant has also produced as witnesses Juan Bojorquez and John Walker.

The first of these swears that he knew of Ortega's owning the rancho as early as 1841, and that he was in possession of it in 1839, when he had a small house on it. But in this last statement he is unfortunately contradicted by Ortega himself, who states that he did not occupy the land in person, but that Miranda occupied it for him in 1840. And if, in 1841, Juan Bojorquez knew that Ortega owned the rancho, it is strange that his father, Bartolome Bojorquez, in 1844, described it in his petition and map as the land of Juan Miranda. John Walker testifies that Ortega told him, in 1843, that he owned the rancho, and that it was generally reported in Sonoma to belong to him. He "never heard it denied or contradicted." But against this statement we have the fact that three colindantes, who would naturally be best informed as to the ownership of lands adjoining their own, describe the land as that of Miranda, in apparent ignorance of any rights of Ortega, and Leese, the alcalde of Sonoma, gives his certificate of vacancy, in 1844, to Miranda, when the latter applied for the land.

Some reliance is placed by the claimant on the fact that Theodore Miranda was present, and made no opposition, when Ortega in 1849 put Father Brouillet in possession; but this circumstance seems unimportant. Theodore Miranda had no title papers to the land; his father, as before explained, having failed to obtain any. He seems to have been discontented with, though not to have actually opposed, Ortega's proceedings, and the inference that he recognized Ortega's title seems conclusively rebutted by Ortega's own statement that on his return from Oregon he demanded the possession of the land from Theodore Miranda's mother, which the latter refused, claiming that the rancho was her own.

To meet the evidence furnished by the expedientes which have been referred to, the claimant has produced the record of judicial possession of the neighboring rancho of Novato, in which the name of Ortega occurs amongst others, who are spoken of as "colindantes and circunvecinos." But it does not appear from this record whether Ortega was, as spoken of, a "colindante" or a "circunvecino." If as a "circunvecino," he was only called a resident of the neighborhood,— a term which might have been applied to him if he was residing in Sonoma, or been a "vecino de esta jurisdiccion." That he could not have been a "colindante" or coterminous proprietor is evident, just from the fact that he was appointed as a measurer of the Novato Rancho, a duty not legally or usually assigned to neighbors directly interested in the question of boundary; and, secondly, from the fact that the Rancho del Arroyo de San Antonio, claimed by Ortega, is not colindante with the Novato Rancho, for the Olimpali lies between them.

The claimant has also referred to a pas-

sage in the work of Duflot de Maufras, a French traveler, who, in the years 1840, 1841, and 1842, visited this country, and in 1844 published at Paris an account of his explorations. In his description of the country to the north of the Bay of San Francisco, he enumerates various ranchos, and, among others, those of "Ortega, Martin, Petaluma, the Vallejos," etc. It, of course, does not appear from whom De Maufras obtained his information. His statements may, perhaps, be accepted as proof that he was told by some one he thought reliable that Ortega owned a rancho in that vicinity. But such information, obtained and repeated by a traveler, can hardly be received as proof of the fact; especially when we have the incontrovertible evidence furnished by the expedientes of Miranda and of three other adjoining ranch owners that the lands were designated and treated by them and the government as those of Miranda, and not Ortega.

The title papers of Ortega, produced by the claimant, present, in some respects, a suspicious appearance.

I· pass over, as too inconclusive to merit attention, the observations which have been made on the supposed difference between the handwriting of Vallejo and Alvarado, as it appears on these papers, and other writings of theirs, at the time they are dated; but it is evident that the date of the marginal order of Alvarado was originally 1841, and has been altered to 1840. This alteration has· apparently been made with ink of the same color as that with which the decree of concession was written. It is difficult to account for this circumstance. It is highly improbable that it was merely a clerical mistake, for it can hardly be supposed that a document would be dated a year in advance by mistake. Besides, if such a mistake did occur, it would scarcely have escaped notice at the time. But the correction, in this instance, is made with ink of another color, and apparently at a time subsequent to that at which the marginal order was written. It is said that there could have been no motive for the alteration, for the papers would have been as good if dated in 1841 as in 1840. But the fact remains that the marginal order for Vallejo's report was originally dated subsequently to the report itself, and the concession purporting to be founded on the latter.

A possible explanation of the alteration may be found by supposing the petition to have been drawn in 1840, the marginal order made in 1841, and the proceedings then to have stopped. On Ortega's return from Oregon, he may have procured from Vallejo an antedated report, and from the governor an antedated decree of concession. These may have been dated 1840, to conform to the petition dated in that year, and without observing that the marginal order was dated

1841. On noticing the discrepancy, the date of the marginal order may have been altered so as to correspond with that of the other documents, or the date of the order may have been altered to 1840, under the idea that Ortega had gone to Oregon in 1841,—an erroneous impression, which Alvarado appears to have entertained, as is shown by his deposition.

This explanation is, of course, merely conjectural, but the claimant has been wholly at a loss to offer any, except the extremely improbable one that Alvarado, when writing the order, in 1840, wrote the date 1841 by mistake, and that the mistake escaped notice at the time, and was corrected subsequently, as appears by the difference in the color of the ink. But if the explanation I have suggested be received, there will then be afforded that slight basis of fact upon which fraudulent pretensions have usually been erected; for it rarely happens that parties are audacious enough to manufacture title papers, so to speak, "out of whole cloth," and where the pretended grantee has never had any connection with the land, or taken a single step towards obtaining a title to it. The explanation will also serve to reconcile the theory of the United States with the statements of De Maufras and of Ortega in Oregon; for the latter, knowing he had applied for the land, and that an order for an informe had been made, might not, unnaturally, have considered himself as having obtained some right to it, and he, or some other, may have so stated to De Maufras. It is possible that Miranda, after obtaining permission to occupy from Vallejo, may have agreed that Ortega should apply for the land, to be held for their joint benefit, and thus the idea may have been suggested that Miranda was merely the tenant of Ortega.

In the foregoing view of the evidence, every important fact and consideration has, I believe, been noticed. It is evident that the circumstances of the case differ widely from that of U. S. v. Alviso [supra]. Not only is there no trace of the existence of this grant in the archives, but those records furnish strong presumptive evidence against its genuineness. The title papers are produced from the claimant's own custody, and their genuineness sought to be established by the testimony of witnesses known to have been connected with previous frauds, similar to that alleged in this case, whom the supreme court has declared unworthy of belief, and every one of whom, except Richardson, has been a party· to the crime. The only witness who pretends to account for the map, and who, from the fact that the petition is in his handwriting, must have had some connection with the matter, gives on that and on other subjects testimony the falsehood of which is apparent; and the proofs in the cause show that this important docu-

ment was a copy of that presented by Miranda four years after it is alleged to have been presented by Ortega.

We find that another of the title papers has been altered as to the date, that no explanation of this circumstance is afforded, nor can any be suggested consistently with the bona fides of the transaction, except one almost too improbable to be supposed. In the case of Alviso, the supreme court, when considering the equities of the claimants, observe that "no imputation has been made on the integrity of his documentary evidence." In the case at bar, not only has such an imputation been made, but the proofs are such as to cause serious doubts as to the genuineness of the title papers. But the cases differ in another respect. In Alviso's Case "no suspicions were raised unfavorable to the continuity of the claimant's possession and claim." In this case it is not pretended that the claimant ever occupied the land in person. He alleges that another person occupied it for him. But the parol testimony by which he seeks to establish the fact is not only unreliable, from the character of the witnesses, but their statements are inconsistent with the evidence furnished by the archives, so far as we could expect those records to furnish any evidence upon the subject. The supposed occupation by Miranda, as the agent or tenant of Ortega, appears to have been unknown to any of the persons owning adjoining ranchos, and the government itself, acting on the report of the alcalde of the district and of the secretary, directed a title to issue to Miranda for the land as public, and liable to grants. The permission to occupy, alleged to have been given by Vallejo to Ortega, was apparently unknown to the latter when he made his deposition; at least he fails to make any allusion to it, while the Miranda expediente and other proofs render. it highly probable that it was, in fact, given to the latter.

We find that by Ortega's own account he neglected, during the whole period from the date of the concession (1840) until 1843, when he went to Oregon, to take any steps to perfect his title, as required by the colonization laws and expressly enjoined in the concession itself. In 1843 he departs to a foreign country, under circumstances from which an intention to abandon his own might well be inferred, and returns to the governor all the evidence of his title. Whether, then, we consider the doubtful and unsatisfactory evidence of the genuineness of the title papers, or the absence of all proofs of an ancient and generally recognized possession and the right of ownership, the claim in this case seems destitute of merit.

A decree rejecting the claim must be entered.

NOTE. Since the foregoing opinion was written, I have been reminded of the fact that the sessions of the district court at which the cause was first heard was held by both judges, before whom an elaborate argument was had. The papers were taken, however, by the circuit judge, by whom the case was investigated, and who prepared and delivered the opinion of the court. It is therefore inaccurate to say that the claim was originally confirmed at a term of the court held by the circuit judge. The fact that the cause was investigated and the opinion delivered by the circuit judge, and that I concurred in the decision, without giving to the case that thorough personal examination which I otherwise should have done, left me under the impression that, as stated in my recent opinion, the cause was decided, in form, as well as in fact, by the circuit judge alone.

[The decree rejecting the claim was affirmed by the supreme court. 1 Wall. (68 U. S.) 660.]